UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                )
JULIA BONANNO, as guardian representative )
for A. Kenneth Bonanno,                         )
                                                )
        Plaintiff,                              )
                                                )
        v.                                      )        Civil Action No. 10-11322-DJC
                                                )
BLUE CROSS AND BLUE SHIELD                      )
OF MASSACHUSETTS, INC. and                      )
RAYTHEON HEALTH BENEFITS PLAN,                  )
                                                )
        Defendants.                             )
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                               October 14, 2011

## I.      Introduction

        Plaintiff Julia Bonanno ("Bonanno") brings this action against Defendant Blue Cross and

Blue Shield Massachusetts, Inc. ("Blue Cross") and Raytheon Health Benefits Plan (collectively,

"Defendants") under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et.

seq.* ("ERISA") alleging that Blue Cross improperly denied her reimbursement for certain medical

care for her late husband, A. Kenneth Bonanno ("Mr. Bonanno").   Defendants and Bonanno have

now both moved for summary judgment.   For the reasons set forth below, Defendants' motion for

summary judgment is GRANTED and Bonanno's motion for summary judgment is DENIED.

II.     **Background**[1]

    A.     **Coverage Under the Plan For Mr. Bonanno's Medical Treatment**

Mr. Bonanno was an employee of Raytheon Company ("Raytheon") and a participant in

Raytheon's health benefits plan (the "Plan").   (Pl. Resp. to Def. Statement of Facts ¶ 1).   Blue

Cross,  a non-profit health and medical services corporation, functioned as a claims administrator

for Raytheon, which is self-insured.   (Pl. Resp. to Def. Statement of Facts ¶ 3; AR 211).   The

Raytheon 2008 Benefits Handbook is a summary plan description for Raytheon's employee benefit

plans  ("Raytheon SPD").  The Raytheon SPD provides that:

> Each claims administrator has the authority to make final decisions with respect
> to paying claims. . . . In making a final decision, the applicable claims
> administrator and the plan administrator have full discretionary power to interpret
> the meaning of plan provisions and determine all questions arising under a plan,
> including, but not limited to, eligibility for benefits.

AR 199.

    Section 7.2 of the Plan document provides the following:

> The Plan Administrator and the Claims Administrator, within their respective
> areas of authority, shall have absolute discretion to construe and interpret any and
> all provisions of the Plan and the Benefit Programs, including but not limited to,
> the discretion to resolve ambiguities, inconsistencies, or omissions conclusively,
> and to decide questions of fact . . . With respect to all issues arising under claims
> for benefits and appeals with respect thereto, the Claims Administrator shall have
> full discretion and final authority to interpret the Plan, and its decisions as to
> claims shall be binding and conclusive upon all persons.

AR 735.

    The terms and provisions of Mr. Bonanno's health care coverage are set out in the Benefit

---

[1]All facts are drawn from the administrative record the parties jointly submitted to the
Court, unless otherwise noted.  All references to the administrative record shall be "AR" and
"AKB."

Description of the Blue Choice New England Plan 2 ("Benefit Description").  The Benefit

Description "provides [a member] with a complete description of [his or her] benefits . . . [and]

explains [a member's] benefits and the terms of [his or her] coverage under [the Blue Choice New

England Plan 2]."  AR 26.  The Benefit Description provides that the Plan covers only services that

are "*medically necessary*."  AR 42 (emphasis in original).[2]  To qualify as "medically necessary,"

the services must be (1) "required to diagnose or treat [a participant's] illness, injury, symptom,

complaint or condition"; (2) "consistent with the diagnosis and treatment of your condition and in

accordance with *Blue Cross and Blue Shield* medical policy and *medical technology assessment*

*guidelines*"; (3) "[e]ssential to improve [the participant's] net health outcome and as beneficial as

any established alternatives covered by this health plan"; (4) "[a]s cost effective as any established

alternatives"; and (5) "[f]urnished in the least intensive type of medical care setting that is required

by [a participant's] medical condition."  AR 42 (emphasis in original).  "It is not a service that . .

. is furnished solely for [a participant's] convenience . . . or the convenience of [a participant's]

family or health care provider . . . or increases or enhances [a participant's] environmental or

personal comfort."  AR 42.  The Benefit Description further states that "*Blue Cross Blue Shield* .

. . decides which health care services are *medically necessary* and appropriate for [a participant] by

using" the above guidelines.  Id. (emphasis in original).

On November 1, 2008, Rider 08-831 was appended to the Benefit Description.  The

---

[2]The Benefit Description for Inpatient Medical and Surgical Care states that "[w]hen inpatient care is approved by Blue Cross and Blue Shield, this health plan provides coverage for as many days as are medically necessary . . . ."  AR 59.  Rider 01-319 to the Benefit Description ("Inpatient Admissions") provides that "[w]hen [the participant is] admitted to a rehabilitation hospital or skilled nursing facility for inpatient covered services, this health plan provides benefits for as many days as are medically necessary."  AR 123.

explanation of medically necessary services provided in Rider 08-831 is almost identical to that set forth in the Benefit Description.  Rider 08-831 provides that to be covered under the "*contract*, all of [the participant's] health care services must be *medically necessary*" and grants Blue Cross the authority to "decide[] which health care services that [a participant] receive[s] (or [is] planning to receive) are *medically necessary* and appropriate for coverage."   AR 137 (emphasis in original). To qualify as medically necessary, the services must be:  (1) "required services that a health care provider, using prudent clinical judgment, would provide to a patient in order to prevent or to evaluate or to diagnose or to treat an illness, injury, disease or its symptoms"; (2) "furnished in accordance with generally accepted standards of professional medical practice"; (3) "clinically appropriate, in terms of type, frequency, extent, site and duration; and they must be considered effective for [a participant's] illness, injury or disease"; (4) "consistent with the diagnosis and treatment of [a participant's] condition and in accordance with *Blue Cross Blue Shield* . . . medical policy and *medical technology assessment guidelines*"; (5) essential to improve [a participant's] net health outcome and as beneficial as any established alternatives that are covered by the Blue Cross"; (6) "consistent with the level of skilled services that are furnished and furnished in the least intensive type of medical care setting that is required by [a participant's] medical condition"; and (7) "not more costly than an alternative service or sequence of services at least as likely to produce the same therapeutic or diagnostic results to diagnose or treat [a participant's] illness, injury or disease."  AR 137 (emphasis in original).  Rider 08-831 further states that "[t]his does **not** include a service that: is primarily for  [a participant's] convenience or for the convenience of [a participant's] family or the health care provider . . . or increases or enhances your environmental or personal comfort."  AR 137 (emphasis in original).

4

The Plan does not cover custodial care.  The Benefit Description provides that "[n]o benefits are provided for *custodial care*.  This type of care may be furnished with or without routine nursing or other medical care and the supervision or care of a physician."  AR 89 (emphasis in original).  Custodial care is defined in the Benefit Description as care "that is given primarily by medically-trained personnel for a *member* who shows no significant improvement response despite extended or repeated treatment; or care that is given for a condition that is not likely to improve, even if the *member* receives attention of medically-trained personnel . . . ."  AR 39 (emphasis in original).  The Raytheon SPD also informs Raytheon employees that the Plan does not cover custodial care, including "services to a member whose condition is not likely to improve, even if the covered person receives the regular attention of medically-licensed staff."  AR 191.

### B.    Mr. Bonanno's Medical Condition and Treatment

In May 2007, Mr. Bonanno was admitted to Lawrence General Hospital and underwent a nephrectomy (surgical removal of a kidney) for renal cell cancer. (Compl. ¶¶ 13-14; AR 499).  He had a heart attack while undergoing cancer treatment.  (AR 499).  The loss of oxygen he experienced caused brain damage.  Id.

#### 1.    Bonanno's Claim With Respect to Mr. Bonanno's Stay at Kindred Hospital

On July 27, 2007, Mr. Bonanno was transferred from the intensive care unit at Lawrence General Hospital to a chronic care unit at Kindred Hospital in Boston where he remained through August 2008.   (AR 499, 522).   On a periodic basis, Blue Cross approved and paid for Mr. Bonanno's stay at Kindred Hospital in 2007 and through April 2008.  (AR 229, 237, 255, 270).  The disputed claims in this case concern reimbursement for services beginning May 1, 2008 and ending on April 30, 2009, when Mr. Bonanno's coverage under the Raytheon Plan terminated.  (AR 311-23,

502).

Sadly, throughout his stay at Kindred Hospital, Mr. Bonanno was in a persistent comatose vegetative state.   (AR 251, 260, 262; AKB 13, 20, 22, 30, 41, 42).   He was "essentially quadriplegic,"  (AKB 73), and suffered from "severe anoxic encephalopathy," AR 285, 286; AKB 8, 4937; that is, severe brain damage due to lack of oxygen.   He was unresponsive and did not follow cues or commands. (AR 284, 289).  He required mechanical ventilation, received nutrition through a tube and was fully dependent for care and mobility. (AR 284, 499).   Mr. Bonanno was unable to communicate and make his needs known.  (AR 500).   He also suffered from "morbid obesity," weighing over three hundred pounds.  AR 284; AKB 30.

His physicians concluded that Mr. Bonanno had "very little if no hope for neurological recovery," that he "had reached the maximum recovery potential," AKB 4937-38, and that he was "very ill" and had a "very poor prognosis" for recovery.  AKB 5002.

On April 25, 2008, Blue Cross requested an extensive clinical update and the case was sent to Blue Cross' Physician Review Unit for a level of care determination.  (AR 262-63).   Four days later, on April 29, 2008, Phyllis Troia, M.D., a physician reviewer for Blue Cross and board-certified in internal and emergency medicine, reviewed the clinical notes and medical records of Mr. Bonanno's stay at Kindred Hospital and spoke to Mr. Bonanno's two treating physicians, Drs. Kenney and Trayner.  (AR 265-66).  After review of Mr. Bonanno's care utilizing the standardized guidelines known as McKesson's InterQual criteria, Dr. Troia concluded that Mr. Bonanno's condition "did not meet the medical necessity criteria required for coverage of chronic hospital stay."  AR 311; 266.  Dr. Troia found that "the care given beyond the last approved date could have been given in a less medically intensive setting," that the care given to Mr. Bonanno was "not likely

to improve [his] functional abilities" and that he was therefore receiving custodial care.   AR 266. Dr. Troia indicated that Mr. Bonanno's treating physicians stated that he had "suffered anoxic brain damage, is comatose, is ventilator dependent, and dependent for all care" and that "there is no expectation of progress or improvement" and agreed that "care is chronic." Id. Dr. Troia noted that Mr. Bonanno's treating physicians agreed with Blue Cross' decision.  Id.  On this basis, Dr. Troia recommended denial of coverage after the last previously approved date, April 30, 2008.  Id.

Based upon this recommendation, Blue Cross' Physician Review Unit denied Mr. Bonanno's coverage claim for treatment at Kindred Hospital from May 1, 2008 forward.  (AR 311).  Dr. Troia sent a letter dated April 30, 2008, to Mr. Bonanno and Mr. Bonanno's primary treating physician, Dr. Kenney, stating that Blue Cross could not approve coverage for any period after April 30, 2008 and explained Blue Cross' reasons for doing so.  (AR 311-23).

### 2.   Bonanno's Claim With Respect to Mr. Bonanno's Stay at the Skilled Nursing Facility

On August 7, 2008, Mr. Bonanno's caretaker requested approval of admission for his transfer to a skilled nursing facility, Exeter Healthcare.  (AR 273, 277).   The next day, on August 8, 2008, Dr. Eng-Hwi Kwa, M.D., physician reviewer for Blue Cross who is board-certified in internal medicine, (AR 217-220), reviewed the clinical notes and medical record for Mr. Bonanno's admission to the skilled nursing facility.  (AR 276).  Dr. Kwa also spoke to Dr. Kenney who agreed that there was "no potential for improvement," that Mr. Bonanno was in "custodial care" and that he had "failed past rehab[ilitation] and chronic care."  (AR 276-77).  Mr. Bonanno remained in a vegetative state.  (AR 273).

 After reviewing Mr. Bonanno's medical care and applying the InterQual criteria,  (AR 327-46), Dr. Kwa concluded that Mr. Bonanno "did not meet the medical necessity criteria required for

coverage of [a] skilled nursing facility stay" and recommended denial of Mr. Bonanno's claim. AR 276.  Dr. Kwa noted that Mr. Bonanno "did not require skilled rehabilitation services daily with the expectation of functional progress," that his "medical condition makes progress unlikely" and that Mr. Bonanno's "goals are not rehabilitation, but maintenance of function."  AR 276.  Dr. Kwa indicated that Mr. Bonanno "ha[d] little rehabilitation potential for improvement."  Id.  Dr. Kwa further noted that Mr. Bonanno's treating physician agreed with this conclusion.  (AR 277).

Accordingly, Blue Cross' Physician Review Unit denied Mr. Bonanno's claim for skilled nursing care.  (AR 327-28).  Dr. Kwa sent letters, dated August 8, 2008, to Mr. Bonanno's caretaker and Dr. Kenney.  (AR 327-28).  The letters noted that Mr. Bonanno's request for a skilled nursing facility stay was denied for lack of medical necessity required for coverage of that type of stay and explained Blue Cross' reasons for doing so.  (AR 327-46).

### C.    Review of Bonanno's Claim for Reimbursement on Appeal

On April 22, 2009, Mr. Bonanno appealed Blue Cross' April 30 and August 8, 2008 decisions denying coverage (concerning the stays at Kindred Hospital and Exeter Healthcare).  (AR 466-93).  The cost of this coverage was not insignificant; by Mrs. Bonanno's estimate, she paid $300,000 for this care out-of-pocket.  (Pl. Memo at 2; see, e.g., AR 687-88).  In response to the appeal, on May 1, 2009, Blue Cross physician reviewer, Christos Hasiotis, M.D., board-certified in surgery, (AR 221), reviewed the clinical notes, records of conversations with Mr. Bonanno's treating physicians, the medical records from the hospital and skilled nursing facility admissions and the relevant utilization review criteria, along with the appeal letter and supporting medical records, the letter of support from the nurse retained by Mr. Bonanno's attorney and relevant medical literature.  (AR 268, 279-80, 566).  In a letter advocating for benefits for Mr. Bonanno, a nurse retained by his

attorney argued, among other things, that attempting to wean Mr. Bonanno from the ventilator was treatment to improve his condition that justified coverage.  (AR 521-22).

        After review of the record, including the attempts to wean Mr. Bonanno from the ventilator, Dr. Hasiotis recommended partial reversal of Blue Cross' previous decisions denying coverage. (AR 269-71, 80-81).

        With respect to the hospital stay, Dr. Hasiotis recommended approval of services from May 27, 2008 through July 21, 2008 and October 21, 2008 through January 9, 2009, but not for the periods from (a) May 1, 2008 through May 26, 2008, (b) July 22, 2008 through October 20, 2008 and (c) from January 10, 2009 forward.  (AR 268-69, 270 (totaling days approved)).  Dr. Hasiotis recorded the following explanation for denying coverage for the indicated periods:

> The member did not meet the medical necessity criteria required for coverage of chronic hospital stay. Coverage was denied because the care given can be delivered in a less medically intensive setting and the care given beyond the last approved date could have been given in a less medically intensive setting.

AR 269, 676.   Dr. Hasiotis explained the difference between the periods approved and periods denied, stating that Mr. Bonanno "was undergoing a prolonged weaning process [from the ventilator] during the periods approved."  AR 269.  See AR 676 ("Additional information regarding periods of denial:  05/01/08 – 05/26/08 - Member was not being actively weaned. 07/22/08 thru 10/20/08 - Member was being maintained with tracheostomy collar and 02 28-35% during the day for 7 to 12 h[ou]rs with ventilator assistance during th[e] night. From 01/10/09 onwards member was of[f] mechanical ventilation").

        As to the skilled nursing facility stay, Dr. Hasiotis recommended approval of the skilled nursing services for the first stay (from August 8 through October 20, 2008) but not for the second

stay (from January 10, 2009 forward).   AR 659.  In recommending coverage for the first stay, Dr.

Hasiotis noted that Mr. Bonanno was being maintained "with [a] tracheostomy [collar] with frequent

suctioning during the day and on mechanical ventilation through the night."  AR 658.  Dr. Hasiotis

recorded the following explanation for denying coverage for the indicated periods:

> Care can be provided at a lesser setting.  Member continues off
> mechanical ventilation, member remains totally dependent for
> all functions [and] remains with quadriplegia.  Prevention and
> management of present decubitus [bedsores] status along with
> management of gastrostomy tube feedings do not require a
> skilled nursing facility.  Member also remains unresponsive,
> [and] unable to participate in active therapy.

AR 567, 659.

On May 7, 2009, Kristen Gake, Blue Cross' Grievance Program Case Specialist, sent Mr.

Bonanno's attorney and Dr. Kenney Blue Cross' response to Mr. Bonanno's April 22, 2009 appeal.

 (AR 569-606).  In her letter, Gake stated that Blue Cross had decided to reverse its decision in Mr.

Bonanno's favor with respect to certain periods of his stay at the hospital and the skilled nursing

facility.  (AR 569-72).  The letter indicated that, based on the review of his medical records, Blue

Cross approved coverage at Kindred Hospital from May 27, 2008 through July 21, 2008 and from

October 21, 2008 through January 9, 2009.   (AR 569-70).  The letter further stated that based on

the medical records, Blue Cross approved coverage at the skilled nursing facility from August 8,

2008 through October 20, 2008.  (AR 570).  Accordingly, Blue Cross agreed to reimburse Mrs.

Bonanno $108,000 for certain periods of her husband's treatment.  (Pl. Memo at 2; AR 570, 693-99).

In her letter, Gake also notified Mr. Bonanno's attorney of Blue Cross' decision to uphold

its denial for the remainder of Mr. Bonanno's stay at Kindred Hospital (from May 1, 2008 through

May 26, 2008 and July 22, 2008 through October 20, 2008, and from January 10, 2009 onward),

based on lack of medical necessity.  (AR 570).

Mr. Bonanno passed away on July 25, 2009.  (Compl. ¶ 15).

## III.    Procedural History

On August 5, 2010, Bonanno filed the instant complaint challenging Blue Cross' denial of health insurance benefits for portions of her husband's medical care at Kindred Hospital and Exeter Healthcare.  (D. 1).   The complaint seeks reimbursement for Mr. Bonanno's healthcare expenses under 29 U.S.C. § 1132(a)(1)(B) (Count I) and attorneys' fees and costs under 29 U.S.C. § 1132(g) (Count II).   After the administrative record was filed with the Court, (D. 14, 15), Defendants and Bonanno each moved for summary judgment in their favor and the Court heard oral argument on their motions.  (D. 16, 19).

## IV.    Discussion

### A.    Standard of Review

In an ERISA benefits case, summary judgment does not operate as a screening mechanism to determine trialworthy issues, but rather is  "simply a vehicle for deciding the issue."  Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005).   The Court "sits more as an appellate tribunal than as a trial court.  It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary."  Leahy v. Raytheon Co., 315 F.3d 11, 18 (1st Cir. 2002).   Thus, in this context, "the factual determination of eligibility for benefits is decided solely on the administrative record, and 'the non-moving party is not entitled to the usual inferences in its favor.'"  Bard v. Boston Shipping Ass'n, 471 F.3d 229, 235 (1st Cir. 2006) (quoting Orndorf, 404 F.3d at 517).

### 1.    Whether Deferential or De Novo Review Should Be Applied

As an initial matter, the parties disagree about the appropriate standard of review that should apply in this case.  In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989), the Supreme Court determined that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  A benefits plan "must *clearly* grant discretionary authority" to the administrator for its decision to be entitled to deference. Rodriguez-Abreu v. Chase Manhattan Bank, N.A., 986 F.2d 580, 583 (1st Cir. 1993) (emphasis added).   If the benefit plan grants the administrator the requisite discretionary authority, "the administrator's decision to deny benefits must be upheld unless it is arbitrary, capricious or an abuse of discretion." Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan, 402 F.3d 67, 74 (1st Cir. 2005) (internal quotation marks and citation omitted); Diaz v. Seafarers Int'l Union, 13 F.3d 454, 456 (1st Cir. 1994).  There are strong policy reasons for such deference.  The Supreme Court has explained that "ERISA represents a careful balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans." Conkright v. Frommert, __ U.S. __, 130 S.Ct. 1640, 1649 (2010) (internal quotation marks and citation omitted).  Deference granted to plan administrators in interpreting an ERISA plan not only preserves such careful balancing, but also "promotes efficiency by encouraging resolution of benefits disputes through internal administrative proceedings rather than costly litigation" and promotes predictability as well as uniformity in that an employer can rely on the expertise of the plan administrator to interpret the plan to avoid "unexpected and inaccurate plan interpretations that might result from *de novo* judicial review." Conkright, 130 S.Ct. at 1649.

Bonanno first argues that Blue Cross is not a claims administrator with the discretionary

authority to determine the eligibility of benefits or construe the terms of the Plan.  (Pl. Opp. at 1-4).

The Court disagrees.   Under 29 U.S.C. § 1105(c)(1), a plan administrator has the authority to

delegate parts of his responsibility to third parties such as claims administration.  That is precisely

what Raytheon did here; Raytheon, as plan administrator, delegated the responsibility of claims

administration to Blue Cross.  See AR 735, 736, 737-38 (Sections 7.1, 7.5, 7.9, 7.10 of the Plan

document); Raytheon SPD, AR 211.  Bonanno acknowledges as much by identifying Blue Cross as

"the claims administrator and insurer of the Raytheon Health Benefits Plan" in her complaint

(Compl. ¶ 2).[3]  Bonanno also concedes that Blue Cross is the claims administrator in her response

to Blue Cross' statement of material facts.  (Pl. Resp. to Def. Statement of Facts ¶ 3).

The Plan grants Blue Cross clear discretionary authority as claims administrator.  The

Raytheon SPD provides that Blue Cross, as claims administrator, has "the authority to make final

decisions with respect to paying claims" and "full discretionary power to interpret the meaning of

plan provisions and determine questions arising under the plan, including, but not limited to,

---

[3]This case presents no conflict of interest as to Blue Cross' duties and responsibilities; its responsibility is that of claims administrator only.  The Plan Document separates Raytheon's responsibility as plan administrator from the responsibility of claims administration which it delegated exclusively to Blue Cross.  See AR 716, 736-38 (Sections 7.5, 7.9, 7.10 of the Plan Document).  Bonanno argues that the Administrative Services Account Agreement ("ASA") destroys Raytheon's delegation of its claim administration responsibilities to Blue Cross.  To support her argument, Bonanno points to the following language in the ASA regarding fiduciary obligations:   "The Account [Raytheon] acknowledges that Blue Cross is not the 'Administrator' of the Accounts health benefit plan(s) . . . nor is it a 'named fiduciary' of these plans . . . ."  Pl. Memo. at 5; AR 1-2.  Such language does nothing to alter Blue Cross' responsibility as claims administrator.  The ASA merely makes clear that Blue Cross is not the plan administrator and that it is not responsible for funding the Plan and that Blue Cross has no fiduciary obligation to the "Account" - i.e., to Raytheon - when negotiating with third parties, such as hospitals.  This is consistent with the language contained in the Plan Document (Sections 7.7.5, 7.9 and 7.10).

eligibility for benefits." AR 199.[4]   The Benefit Description states that Blue Cross "decides which

health care services are *medically necessary* and appropriate for you." AR 42 (emphasis in original).

Moreover, the Plan Document explicitly provides that: "the Claims Administrator . . . shall have

absolute discretion to construe and interpret any and all provisions of the Plan and the Benefit

Programs . . . the Claims Administrator shall have full discretion and final authority to interpret the

Plan, and its decisions as to claims shall be binding and conclusive upon all persons." AR 735.

Other courts in this district have found similar language in an employee benefits plan to grant

Blue Cross clear discretionary authority.  See, e.g., Smith v. Blue Cross Blue Shield of Mass., Inc.,

597 F. Supp. 2d 214, 219 (D. Mass. 2009) (finding the Plan granted discretionary authority to Blue

Cross where the Plan stated that Blue Cross had "full discretionary authority to make decisions

regarding eligibility for benefits" and "to conduct medical necessity review" as well as stating that

"[a]ll determinations of Blue Cross . . . . will be conclusive and binding on all persons unless it can

be shown that the interpretation or determination was arbitrary or capricious"); Jon N. v. Blue Cross

Blue Shield of Mass., Inc., 684 F. Supp. 2d 190, 199 (D. Mass. 2010) (same).

In light of the Court's finding that Blue Cross, as claims administrator, had clear

---

[4]In support of her argument that Blue Cross cannot rely on the Raytheon SPD to show it
has discretionary authority as the claims administrator to determine eligibility of benefits,
Bonanno cites the Supreme Court's recent decision in CIGNA Corp. v. Amara, ___ U.S. ___,
131 S.Ct. 1866, 1878 (2011).  Bonanno's reliance on Amara is misplaced.  There, the Supreme
Court held that § 502(a)(1)(B) does not grant courts the power to change the terms of a plan, it
only allows them to enforce those terms.  Id. at 1876-77.  It also concluded that plan summaries
cannot be enforced under § 502(a)(1)(B) as the terms of the plan itself, stating that "summary
documents, important as they are, provide communication with beneficiaries about the plan, but [
] their statements do not themselves constitute the terms of the plan for purposes of §
502(a)(1)(B)."  Id. at 1877.  Here, the Raytheon SPD does not add or alter terms to the benefits
provided by the Plan itself and there is no inconsistency between the services covered by the
Plan and those that are summarized in the SPD.  Compare  AR 735-38 with AR 199.

discretionary authority to determine benefits under the Raytheon SPD and the Plan document, the arbitrary and capricious standard of review applies here.

**B.    Denial of Coverage**

**1.    Arbitrary and Capricious Standard of Review**

The arbitrary and capricious standard of review is deferential; that is, "the court is not to substitute its judgment for that of the [administrator]." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). "[T]he administrator's decision must be upheld if it is reasoned and supported by substantial evidence." Gannon v. Metro. Life Ins. Co., 360 F.3d 211, 213 (1st Cir. 2004) (citation omitted).   "Evidence is substantial if it is reasonably sufficient to support a conclusion, and the existence of contrary evidence does not, in itself, make the administrator's decision arbitrary." Id.   The Court must decide only whether the administrator's denial of benefits was irrational, with any doubts resolved in favor of the administrator.   Liston v. Unum Corp. Officer Severance Plan, 330 F.3d 19, 24 (1st Cir. 2003).

**2.    Blue Cross' Decision To Deny Coverage Was Not Arbitrary and Capricious**

Pursuant to the Benefit Description and relevant Plan documents, a claimant is only entitled to coverage if a service is "medically necessary."  Blue Cross had the discretionary authority to decide which services were medically necessary based on analyzing whether certain criteria were met.   As discussed above, several criteria must be met for a service to qualify as medically necessary; medically necessary services are those that are, among other things, "essential to improve [the participant's] net health outcome" and "[f]urnished in the least intensive type of medical care setting required." AR 42. Custodial care, which includes care given by medically-trained personnel for a member who shows no significant improvement response despite repeated treatment or given

for a condition that is not likely to improve, even if the member receives attention by medically-trained personnel, is not covered under the Plan.   AR 191.

**a.      Mr. Bonanno's Stay at Kindred Hospital**

**I.      Denial of Coverage For Certain Periods of Stay**

On appeal, Blue Cross affirmed its denial of coverage for the periods from (a) May 1, 2008 through May 26, 2008, (b) July 22, 2008 through October 20, 2008 and (c) from January 10, 2009 forward.  (AR 268-70).

Denial of this coverage was rational based upon the review of qualified physicians, applying standardized criteria to records of Mr. Bonanno's medical care and input from his treating physicians.  Substantial evidence in the administrative record supports Blue Cross' conclusion.  Mr. Bonanno's medical records, clinical notes and the reviewing physician's notes of his conversation with Mr. Bonanno's treating physicians, Drs. Kenney and Trayner, indicate that Mr. Bonanno was in a persistent vegetative state and was fully dependent for care and mobility.  Mr. Bonanno's treating physicians observed that Mr. Bonanno had **"**very little if no hope for neurological recovery" and "had reached the maximum recovery potential," AKB 4937-38.  They also indicated that "there [was] no expectation of progress or improvement" and agreed that "care [was] chronic."  AR 266. In upholding Blue Cross' decision to deny coverage for these periods, Blue Cross physician reviewer Dr. Hasiotis indicated that during the periods of his stay for which coverage was denied, no efforts were made to wean Mr. Bonanno off the ventilator as they were during other periods of his stay at the hospital and that the care provided after such attempts to wean him from the ventilator was custodial in nature.  AR 269, 676.  Dr. Hasiotis explained that "the care given can be delivered in a less medically intensive setting and the care given beyond the last approved date could have been

16

given in a less medically intensive setting." AR 269, 676.   Accordingly, Blue Cross' denial of coverage for Mr. Bonanno's care at Kindred Hospital from May 1, 2008 through May 26, 2008, July 22, 2008 through October 20, 2008 and from January 10, 2009 forward was not arbitrary and capricious.

### ii.      Approval of Coverage For Certain Periods

Similarly, Blue Cross' decision to approve coverage for services from May 27, 2008 through July 21, 2008 and October 21, 2008 through January 9, 2009 for Mr. Bonanno's stay at Kindred Hospital is supported by substantial evidence.   Dr. Hasiotis examined the record and the relevant criteria for medical necessary services including the McKesson InterQual criteria.  Consistent with Blue Cross' decision to uphold the denial of coverage for certain periods because Mr. Bonanno was not being weaned off the ventilator during that time, Blue Cross approved coverage for only the periods during which Mr. Bonanno was being weaned off the ventilator (AR 268-70) because according to the criteria, such treatment was provided to likely improve his underlying condition and therefore constituted a medically necessary service.   Dr. Hasiotis explained the difference between the periods approved and those denied, stating that Mr. Bonanno "was undergoing a prolonged weaning process during the periods approved."  AR 269, 676.

Bonanno argues that Blue Cross' decision to approve coverage for certain periods of time, while denying it for others, was arbitrary.  (Pl. Reply at 1-4).  To support her argument, Bonanno contends that Blue Cross ignored or gave insufficient weight to certain medical records relating to Mr. Bonanno's treatment at the hospital.  For example, Bonanno points to certain medical records that Mr. Bonanno was in a vegetative state to show that Blue Cross had approved coverage under the medical necessity criteria even for periods where he was in a vegetative state.   However, as

17

noted above, Blue Cross did not base its decision whether to approve coverage solely on this factor. The record shows, among other things, that Mr. Bonanno's own treating physicians indicated that he was not likely to improve, (AR 266), that he "had reached his maximum recovery potential," AKB 4937-38, and that his care was chronic.  AR 266.  Moreover, the "relevant issue is not whether Blue Cross gave appropriate weight to all relevant evidence in the record, but whether sufficient evidence exists to support Blue Cross' denial." Island View Residential Treatment Ctr., Inc., Blue Cross Blue Shield of Mass., Inc., 2007 WL 4589335, at *21 (D. Mass. Dec. 28, 2007).  Blue Cross found additional periods of Mr. Bonanno's hospital stay covered because of the attempts to wean him off the ventilator and that Mr. Bonanno "was undergoing a prolonged weaning process during the periods approved."  AR 269, 676.  Consistent with the factual record, see, e.g., AKB 16, 19, 25, 38, 73, 81, 4937, 4949, 4964, 4972, 3478, 3827, Bonanno has conceded that this was the reason for Blue Cross' decision.  (Pl. Resp. to Def. Statement of Facts ¶¶ 36, 39).  Even if evidence did exist in the administrative record that could potentially support a different conclusion, this would not mean that Blue Cross' denial was arbitrary or capricious.  Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998) (explaining the key inquiry for a court analyzing an insurance provider's decision under the arbitrary and capricious standard is "not which side we believe is right, but whether [the insurer] had substantial evidentiary grounds for a reasonable decision in its favor").

Bonanno also claims that Blue Cross did not sufficiently explain its decision in its letters denying coverage for certain periods during Mr. Bonanno's stay at Kindred Hospital.  This is not the case.  Blue Cross' letters, dated April 30, 2008 (initial denial of coverage during hospital stay) and May 7, 2009 (decision approving in part coverage during hospital stay), explained that treatment at Kindred Hospital was denied for certain periods because the treatment Mr. Bonanno was receiving

was not likely to improve his condition and was therefore not medically necessary.[5]   The letters

referenced the relevant specific plan requirements for receiving coverage for medically necessary

services and the InterQual criteria to meet the medical necessity test.  AR 315-323, 573-606.  Thus,

the letters provided the Bonannos with "a sufficiently clear understanding of the administrator's

position to permit effective review."  Terry v. Bayer Corp., 145 F.3d 28, 39 (1st Cir. 1998).   Under

ERISA, "[s]o long as the plan participant is provided a sufficient explanation to formulate further

challenges to the denial, it is not necessary for an administrator to provide 'the reasoning behind the

reasons.'"  Mercier v. Boilermakers Apprenticeship & Training Fund, 2009 WL 458556, at *17 (D.

Mass. Feb. 10, 1009) (quoting Gallo v. Amoco Corp., 102 F.3d 918, 922 (7th Cir. 1996)).   "[A]ll

[the administrator] has to give the applicant is the reason for the denial of benefits; he does not have

to explain why it is a *good* reason."  Gallo, 102 F.3d at 923 (emphasis in original).[6]

---

[5]Dr. Troia's April 30, 2008 letter explained that Mr. Bonanno "did not meet the medical necessity criteria required for coverage of chronic hospital stay," "care could have been given in a less medically intensive setting," and the care given was "not likely to improve" Mr. Bonanno's functional abilities and was therefore considered custodial care.  AR 311.  Gake's May 7, 2009 letter gave notice of Blue Cross' decision on appeal, again explaining that coverage was denied for certain periods because Mr. Bonanno "did not meet the medical necessity criteria required for coverage of chronic hospital stay," and "care can be given in a less medically intensive setting."  AR 570.

[6]Bonanno advances the same argument with respect to Blue Cross' letters regarding the denial of coverage for certain periods of Mr. Bonanno's stay at Exeter Healthcare.  Dr. Kwa's August 8, 2008 letter explained that Mr. Bonanno's skilled nursing facility claims were denied for lack of medical necessity, as Mr. Bonanno "did not require skilled rehabilitation services daily with the expectation of functional progress, the medical condition makes progress unlikely, and the goals are not rehabilitation, but maintenance of function" and Mr. Bonanno had "little rehabilitation potential for improvement." AR 327.   This letter dated August 8, 2008 (denial of coverage for care at Exeter Healthcare) and Blue Cross' May 7, 2009 letter (decision upholding in part denial of coverage for certain periods of care at Exeter Healthcare) sufficiently explain Blue Cross' reasons for denying coverage regarding parts of Mr. Bonanno's stay at the skilled nursing facility, namely, that treatment could have been provided in a less intensive setting.  The May 7, 2009 letter also attaches the relevant InterQual criteria with respect to the least intensive

Other courts in this district have found that similar letters from Blue Cross sufficiently explained the reasons for its decision. See, e.g., Island View, 2007 WL 4589335, at *21 (finding sufficient a letter explaining treatment was not covered because it could have been provided in a less intensive setting and the program did not provide certain evaluation and care as well as a letter explaining broadly the reasons benefits were denied); Smith, 597 F. Supp. 2d at 223 (finding that Blue Cross' letter stating that "[p]laintiff's benefits claim was denied because it did not meet the medical necessity criteria for inpatient stay in a mental health facility . . . adequately notified Plaintiff of the reason for the denial as required by the regulations") (internal quotation marks omitted).

Accordingly, for the reasons set forth above, the Court finds that Blue Cross' denial of coverage for treatment at the Kindred Hospital during certain periods was not arbitrary and capricious.

### b.    Mr. Bonanno's Stay at the Skilled Nursing Facility (Exeter Healthcare)

### I.    Denial of Coverage For Certain Periods of Stay

On appeal, Blue Cross upheld the denial of coverage for the second stay at Exeter Healthcare (from January 10, 2009 forward) as not being medically necessary because the care could be provided in a less intensive medical setting.   Blue Cross had initially denied coverage for all of Mr. Bonanno's stay at Exeter Healthcare, finding that such care constituted custodial care, not medically necessary services.  (AR 327-46).

As with the denial of coverage of certain periods of Mr. Bonanno's stay at Kindred Hospital,

---

setting to qualify as medically necessary services utilized in reviewing Mr. Bonanno's records. (AR 569-606).

there was substantial evidence in the administrative record supporting Blue Cross' decision to deny coverage for his stay at Exeter Healthcare from January 10, 2009 onward.  Blue Cross' physician reviewer, Dr. Kwa, noted that Dr. Kenney stated that there was "no potential for improvement," that Mr. Bonanno is in "custodial care" and that he has "failed past rehab[ilitation] and chronic care." AR 277.  In utilizing the InterQual criteria (AR 315-323) and after speaking with Dr. Kenney, Dr. Kwa determined that Mr. Bonanno "did not require skilled rehabilitation services daily with the expectation of functional progress," that his "medical condition makes progress unlikely" and that Mr. Bonanno's "goals are not rehabilitation, but maintenance of function."  AR 276.  Dr. Kwa indicated that Mr. Bonanno "ha[d] little rehabilitation potential for improvement."  Id.  Dr. Kwa further noted that Mr. Bonanno's treating physician agreed with Dr. Kwa's conclusion.  (AR 277.) Dr. Hasiotis agreed that coverage should have been denied for the period from January 10, 2009 onward, explaining that "care can be provided at a lesser setting" and "[Mr. Bonanno] continues off mechanical ventilation, [he] remains totally dependent for all functions" and "remains with quadriplegia.  Prevention and management of present decubitus [bedsores] status along with management of gastrostomy tube feedings do not require a skilled nursing facility.  [Mr. Bonanno] also remains unresponsive [and] unable to participate in active therapy."  AR 567, 659. Accordingly, Blue Cross' denial of coverage for this period of Mr. Bonanno's stay at Exeter Healthcare was rational and not arbitrary and capricious.

### ii.    Approval of Coverage For Certain Periods

Blue Cross approved coverage for the skilled nursing services for Mr. Bonanno's first stay (from August 8 through October 20, 2008) because of the prolonged weaning process from the ventilator - the same reason for Blue Cross' decision to approve coverage for certain periods of Mr.

Bonanno's care at Kindred Hospital.  AR 676.

In support of her claim that her husband's second stay at the skilled nursing facility should have been covered, Bonanno asserts that the percutaneous endoscopic gastrostomy ("PEG") tube feeding that was provided to Mr. Bonanno at Exeter Healthcare was medically necessary because it required skilled nursing.  Even assuming that gastrostomy tube feeding required skilled nursing, the definition of custodial care under the Plan includes care that is given for a condition that is not likely to improve "even if the member receives attention of medically-trained personnel," AR 39, or "the regular attention of medically-licensed staff."  AR 191.  Thus, even if skilled nurses must administer the PEG, in light of all of the other evidence in the record about Mr. Bonanno's condition during the latter part of his stay at Exeter Healthcare, such care was still custodial in nature and therefore not covered under the Plan.  The same holds true for the other treatment Bonanno argues required medically necessary, not custodial, care, including, but not limited to, tube feeding, respiratory interventions and a specialized mattress. (Pl. Opp. at 11; Pl. Statement of Facts at ¶ 29). After reviewing the medical records, applying the InterQual criteria to Mr. Bonanno's case and denying coverage for certain periods, the reviewing physicians concluded that none of this treatment was likely to improve Mr. Bonanno's underlying condition and was not provided in the least intensive setting possible.

Bonanno's argument that the term "custodial care" is ambiguous is belied by the record.  (Pl. Memo. at 17-19).  Custodial care is defined both in the Benefit Description and the Raytheon SPD; the definitions are nearly identical and, for the reasons stated above, Mr. Bonanno's treatment during

the contested periods fell within this definition.[7]   Bonanno does not address these definitions and

has not shown how Blue Cross has misinterpreted them.  Bonanno's reliance on various cases to

argue that Blue Cross misinterpreted "custodial care" and that the term is ambiguous as defined

under the policy is misplaced.  In three of the cases Bonanno cites, the Plan provided no definition

of custodial care and are thus inapplicable here.  See Dvorak v. Metro. Life Ins. Co., 965 F.2d 606,

610 (8th Cir. 1992) (where ERISA plan had no definition of custodial care, the magistrate judge

formulated a definition for the term); Pritt v. United Mine Workers of Am. 1950 Benefit Plan and

Trust, 847 F. Supp. 427, 430 (S.D.W.Va. 1994) (noting that the "instant Plan [does] not define

'custodial care'"); Burgin v. Office of Pers. Mgmt., 120 F.3d 494, 498-99 (4th Cir. 1997) (same).

Barnett v. Weinberger, 818 F.2d 953 (D.C. Cir. 1987), also cited by Bonanno, is distinguishable

from the instant case since it turned on the definition of custodial care under a federally-subsidized

health care program available to dependents of active-duty military personnel and others in light of

the Dependents' Medical Care Act. Id. at 955, 959.  Bonanno's citation to Watts v. Organogenesis,

Inc., 30 F. Supp. 2d 101 (D. Mass. 1998) is likewise of no help.  There, the health insurance plan

had a definition of custodial care that included care "not reasonably expected to improve the

underlying medical condition." Id. at 110.  The issue was whether the plaintiff's condition was

uniquely severe and whether the evidence established that the services of a nurse sought by

plaintiff's family were reasonably expected to improve the plaintiff's underlying medical condition

---

[7]The Benefit Description provides that custodial care is "[c]are that is given primarily by medically-trained personnel for a member who shows no significant improvement response despite extended or repeated treatment; or care that is given for a condition that is not likely to improve, even if the member receives attention of medically-trained personnel." AR 39.  The Raytheon SPD defines custodial care as "services to a member whose conditions is not likely to improve, even if the covered person receives the regular attention of medically-licensed staff." AR 191.

of autonomic dysreflexia.  Id. at 106-07.  Such is not the case here.[8]

Bonanno also argues that Blue Cross cannot discredit "reliable evidence, including the opinion of the treating physicians" in this case.  (Pl. Memo. at 11).  Yet, Bonanno points to no opinion in the record from the treating physicians that contradicts Blue Cross' decision.  In fact, the record shows that the treating physicians agreed with Blue Cross' decisions, AR 266, 276-77, and that treating physicians, Dr. Kenney and Dr. Trayner, believed Mr. Bonanno had "very little if no hope for neurological recovery," AKB 4937, that he "had reached the maximum recovery potential," AKB 4937-38, that he was "very ill" and had a "very poor prognosis." AKB 5002.[9]  Even if there was a contradictory opinion from a treating physician here, the treating physician rule - affording special deference to a treating physician's opinion applied in social security appeal cases - does not apply to ERISA cases and thus does not apply here.  See Black & Decker Disability Plan v. Nord,

_____

[8]The fact that Blue Cross "undertook a search for a skilled nursing facility ["SNF"] to provide continuing care," Pl. Memo. at 2; AR 254, does not show, as Bonanno contends, that Blue Cross believed Mr. Bonanno's condition was likely to improve.  The record merely notes that the Kindred Hospital case manager was advised "to initiate a SNF search, as Mr. Bonanno would have multiple skilled needs" and nothing more.  AR 254.

[9]To the extent Bonanno argues that Blue Cross' physician reviewer notes of their discussions with Mr. Bonanno's treating physicians are hearsay and should not have been relied upon by Blue Cross, a document in an administrative record in an ERISA case is "not hearsay inasmuch as this court considers the [documents] not for the truth of the statements therein but for the purpose of determining the bases and the propriety for [defendant's] decision to discontinue plaintiff's disability benefits."  Kiley v. Travelers Indem. Co. of R.I., 853 F. Supp. 6, 9 n.2 (D. Mass. 1994).  The Court follows precisely that approach here.  See also Louis v. Genworth Life & Health Ins. Co., 2008 WL 4450264, at *7 (D. Mass. Sept. 30, 2008) (finding claimant's objection in ERISA case "that the statements relied upon were hearsay . . . is not well taken. [The insurer] was not required to disregard information contained in [the claimant's] claims file unless the information would be admissible in a formal civil trial") (citing Karr v. Nat'l Asbestos Workers Pension Fund, 150 F.3d 812, 814 (7th Cir. 1998) (noting that "[a] pension or welfare fund trustee or administrator is not a court. It is not bound by the rules of evidence")).

538 U.S. 822, 834 (2003) (holding that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician"); <u>Richards v. Hewlett-Packard Corp.</u>, 592 F.3d 232, 240 & n.9 (1st Cir. 2010) (noting that in ERISA cases, "the opinion of the claimant's treating physician . . . is not entitled to special deference" as they are in Social Security disability proceedings) (citing <u>Orndorf</u>, 404 F.3d at 526).[10]

Accordingly, for the reasons set forth above, Bonanno has failed to demonstrate that Blue Cross' decision to deny coverage for certain periods of Mr. Bonanno's care at Exeter Healthcare meet the arbitrary and capricious standard of review.

## V.    Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED and Bonanno's Motion for Summary Judgment is DENIED.

**So ordered.**

/s/ Denise J. Casper
United States District Judge

---

[10]To the extent that Bonanno argues that she is entitled to reimbursement because Blue Cross failed to identify the less intensive setting that would be covered under the policy or locate a specific facility, Pl. Memo. at 15, 17, 19, she cites no authority that Blue Cross is required to do so.  Nonetheless, the record shows that Blue Cross sent Mr. Bonanno's caretaker a letter, dated August 8, 2008, stating that Mr. Bonanno's policy covered "home-based services at a private pay nursing home." AR 327.  Blue Cross subsequently provided Bonanno's attorney the clinical notes confirming this position.  AR 276, 357.  In addition, according to the clinical notes in the record, Blue Cross discussed the appropriate setting of Mr. Bonanno's care with his providers and the hospital.  <u>See, e.g.</u>, AR 228; AR 250.